# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### (Jacksonville)

**UNITED STATES OF AMERICA,**             **CASE NO. 3:98-CR-00336-HLA-JBT-1**

                    **Plaintiff,**

**vs.**

**MICHAEL KEITH DELANCY,**

                    **Defendant.**

_____/

## DEFENDANT, MICHAEL KEITH DELANCY'S MOTION FOR COMPASSIONATE RELEASE AND REDUCTION OF SENTENCE TO TIME-SERVED WITH HOME-CONFINEMENT AND ELECTRONIC MONITORING IMPOSED AS SPECIAL CONDITIONS OF SUPERVISED RELEASE

    **COMES NOW** the Defendant, **MICHAEL KEITH DELANCY,** by and through his undersigned counsel, and presents herewith, his Motion for Compassionate Release and for Reduction of Sentence to Time-Served with Home-Confinement and Electronic Monitoring Imposed as Special Conditions of Supervised Release, and states as follows:

## PERTINENT PROCEDURAL BACKGROUND

    1.    On September 9, 1998, the Defendant was named in one count of a seven-count indictment, charging him with conspiracy to distribute cocaine, cocaine base ("crack"), and heroin from 1984 to 1998, in violation of 21 U.S.C. § 846. [D.E. 1]  (Five other individuals were charged in the Indictment for substantive drug related violations. All five defendants entered guilty pleas prior to trial, pursuant to written plea agreements. [D.E. 98-102])  His case was tried on October 4, 1999.  This jury was unable to reach a verdict, and the trial ended in a mistrial. [D.E. following 211] (oral order granting mistrial).  On November 5, 1999, after retrial, a second jury found the Defendant guilty as charged in the Indictment. [D.E. 249].  On January 31, 2000, the defendant was sentenced to life imprisonment. [D.E. 264]

2.      On February 9, 2000, the Defendant filed a timely notice of appeal. [D.E. 268].   On July 12, 2001, the Eleventh Circuit Court of Appeals affirmed the Defendant's conviction, but found that the life sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and remanded the case to the District Court for the limited purpose of resentencing consistent with 21 U.S.C. §841(b)(1)(C) and 21 U.S.C. §851. [D.E. 297].

3.      On October 3, 2002, the Defendant was resentenced to three hundred sixty (360) months' imprisonment and seventy-two (72) months supervised release. [D.E. 329/330].   On October 9, 2002, a timely notice of appeal was again filed, and on July 9, 2003, the appellate court issued its mandate affirming the Defendant's sentence. [D.E. 342]

4.      Presently, Michael Keith Delancy (Registration Number: 28495-018) is housed at FCI Coleman (Medium) located at 846 N.E. 54th Terrace, Sumterville, FL  33521.  According to the Bureau of Prisons' on-line site, as of the present date his anticipated release date is January 4, 2026, however this date does not reflect what would be an earlier release date to a halfway-house approximately six (6) months earlier and time-credits under The First Step Act which the Federal Bureau of Prisons has yet to "adjust."  Additionally, it should be noted that Michael Keith Delancy is a United States citizen, so it is a reasonable assumption that the halfway-house would be available to this Defendant.  The Defendant has been incarcerated since he was approximately forty-four (44) years of age.

Michael Keith Delancy is now sixty-six (66) years of age, after having been incarcerated since April 21, 1999, thereby serving approximately 260 months of his 360 month sentence. (As noted above, the Defendant has another sixty (60) months left to serve upon his sentence according to the BOP online calculation.)

5.      Title 18 U.S.C. §3582 allows the Court to consider a defendant's motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal

2

a failure of the Bureau of Prisons to bring a motion on the defendant's behalf, or the lapse of 30 days from the receipt of such a request by the Warden of the Defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A).

6.      On or about July 15, 2020, the Defendant submitted his request for compassionate release (reduction in sentence) and/or home confinement to the Warden at FCI Coleman (Medium) based on his medical issues and the risk of COVID-19 pursuant to 18 U.S.C. §3582(c)(1)(A) which was subsequently denied by the Warden on October 23, 2020. (***Exhibit "A"***)

7.      Therefore, the Defendant has exhausted his administrative remedies as required by 18 U.S.C. §3582(c) in that more than thirty (30) days have passed since his request was received by the Warden.

8.      The Defendant is respectfully requesting that this Honorable Court to issue its order reducing his sentence to time-served with a period of home-confinement and electronic monitoring imposed as special conditions of supervised release.

9.      In the event this Court grants the Defendant's request, he will reside with Adrienne L. James at her residence located at 510 Meadow Sage Lane, Fayetteville, GA 30214.  Ms. James is the Defendant's daughter-in-law who is a retired police officer turned entrepreneur. She is a Florida Medicaid provider, providing services to individuals with disabilities in Northeast Florida.

The household will have sufficient finances with which to support themselves without having to be a burden upon any other individual outside of the household, and will have the availability of resources to assure their medical care.

Additionally, the Defendant will be employed by Horse Shoe Carriers, LLC, 3020 S.W. Archer Road, Gainesville, Florida 32608, as an Office Manager Dispatcher. This company has facilities and does business in various states, including Florida and Georgia.  (See correspondence from Horse Shoe Carriers, LLC, attached hereto as ***Exhibit "B"***)

10.     The within Motion for Compassionate Release and for Reduction of Sentence to Time-Served with Home-Confinement and Electronic Monitoring Imposed as Special Conditions of Supervised Release is filed in the utmost of good faith and in the interest of justice. It is respectfully submitted that every day the Defendant spends at FCI Coleman (Medium), he is at risk of contracting COVID-19 with its dire consequences as a result of his medical conditions discussed below.

## FACTUAL BASIS FOR THE RELIEF REQUESTED
## AND
## ARGUMENT IN SUPPORT THEREOF

Michael Keith Delancy is presently sixty-six (66) years of age and suffers from many medical conditions, including, but not limited to: Hypertension, Occlusion and Stenosis of Carotid Artery (40%), Chronic Hepatitis C, Hyperlipidemia, Cardiac Arrhymia (Bradycardia), Prediabetes, Edema; Osteoporosis, and is overweight (BMI of 29.6). (Pertinent portions of the Defendant's most recent (2020) BOP Medical Records are attached hereto as ***Composite Exhibit "C."***)

The CDC states on their website, "The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." Further, courts have repeatedly held that if an inmate has a chronic medical condition that has been identified by the CDC as elevating an inmate's risk of becoming seriously ill from COVID-19, that condition may constitute "extraordinary and compelling reasons." Also, the CDC states that adults of any age with certain underlying medical conditions are at increased risk for severe illness from the virus that causes COVID-19. Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death. Further, the CDC has determined that adults of any age with the following conditions might be at increased risk of severe illness from the virus that causes COVID-19: Hypertension or high blood pressure … Cerebrovascular disease (affects blood vessels and blood supply to the brain)

4

**Hypertension**

The American College of Cardiology/American Heart Association Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults (2017 Guideline) defines Stage 1 Hypertension as a blood pressure at or above 130/80 mm Hg and the CDC defines Stage 1 Hypertension as a blood pressure at or above 130/80 mm Hg and Stage 2 Hypertension (the most severe stage) as a blood pressure at or above 140/90 mm Hg.[1]

Individuals with high blood pressure may be susceptible to becoming seriously ill if exposed to the COVID-19 virus.

With regard to the Defendant's **Hypertension**, a study published by the European Society of Cardiology entitled, "High blood pressure linked to increased risk of dying from COVID-19," dated June 5, 2020, it is stated, "Patients with raised blood pressure have a two-fold increased risk of dying from the coronavirus COVID-19 compared to patients without high blood pressure, according to new research published in the *European Heart Journal* [1] today." [https://www.escardio.org/The-ESC/Press-Office/Press-releases/High-blood-pressure-linked-to-increased-risk-of-dying-from-COVID-19]

A weaker immune system is one reason people with high blood pressure and other health problems are at higher risk for coronavirus. Long-term health conditions and aging weaken your immune system so it's less able to fight off the virus … Another possibility is that the higher risk comes not from high blood pressure itself, but from certain drugs used to treat it -- ACE inhibitors and angiotensin receptor blockers (ARBs). The theory is based on the fact that ACE inhibitors and ARBs raise levels of an enzyme called ACE2 in your body. To infect cells, the COVID-19 virus must attach itself to the ACE2 enzymes. [https://www.webmd.com/lung/coronavirus-high-blood-pressure#1]

---

[1] CDC, *Facts About Hypertension*, https://www.cdc.gov/bloodpressure/facts.htm (last visited Sept. 30, 2020).

In-fact, the CDC has warned that high blood pressure and its treatment lowers a person's immune system making the impact of the virus very severe.

Regarding the Defendant's hypertension, the American Heart Association Guidance regarding high blood pressure (one of the Defendant's conditions) and the COVID-19 virus entitled, "What people with high blood pressure need to know about COVID-19," states in-part:

> "DALLAS, March 31, 2020 — Many people have concerns about staying healthy during the COVID-19 pandemic. *Those with a chronic condition such as high blood pressure — a reading above 130/80 — may face an increased risk for severe complications if they get the virus*…

Data from China and Italy -- countries hit early by the virus -- show higher risk of COVID-19 infections and complications in people with high blood pressure.  In China, 25% to 50% of people who came to hospitals with coronavirus had high blood pressure or another health condition like cancer, diabetes, or lung disease.  In Italy, more than 99% of people who've died from the virus had one of these conditions -- and 76% of them had high blood pressure.  People with high blood pressure are also slightly more likely to die from coronavirus. Their risk is about 6% higher than the overall population.

District courts across the nation, including courts in this district, have found that hypertension, a personal COVID-19 risk factor, in a high-risk prison atmosphere, constitutes "extraordinary and compelling reasons" warranting the granting of compassionate release. *See Lewis*, 2020 WL 4333489 (S.D. Fla. July 20, 2020) (holding that the defendant's high blood pressure, alone, a condition which the CDC states may increase the risk of severe illness from COVID-19, coupled with conditions within a correctional environment, constituted "extraordinary and compelling reasons" could be more extraordinary and compelling than this pandemic" for an

inmate that suffers from a chronic medical condition which the CDC identifies as elevating a person's risk of becoming justifying compassionate release.).[2]

**Occlusion and Stenosis of Carotid Artery**

With regard to the Defendant's **Carotid Artery Disease**, this occurs when fatty deposits (plaques) clog the blood vessels that deliver blood to your brain and head (carotid arteries). The blockage increases your risk of stroke, a medical emergency that occurs when the blood supply to the brain is interrupted or seriously reduced.   Stroke deprives your brain of oxygen. Within minutes, brain cells begin to die. Stroke is the most common cause of death and the leading cause of permanent disability in the U.S.

---

[2] *See also United States of Am. v. Mines*, 4:18-CR-00552, 2020 WL 4003048 (N.D. Ohio July 15, 2020) (holding that the defendant's hypertension, in conjunction with the fact that FCI Coleman Low has had cases of COVID-19, presents extraordinary and compelling reasons that justify the grant of compassionate release); *Salvagno*, 5:02-CR-51 (LEK), 2020 WL 3410601 (N.D.N.Y. Apr. 23, 2020) (a hypertensive prisoner at increased risk from the virus, constituted extraordinary and compelling circumstances that warranted grant of compassionate release) (citing *United States v. Bray*, 19-20216-9, 2020 WL 2494898, at *4 (E.D. Mich. May 14, 2020) (granting pre-trial release to 48-year-old hypertensive inmate otherwise "in good health," noting that "new studies identify an increased risk of death from the virus for individuals with hypertension ... the Court considers these studies indicating that hypertension may be an emerging risk factor for the virus") (citing news articles and recent CDC data); *United States v. Gamble*, No. 19-CR-348, Dkt. No. 59 at 8 (D.D.C. Apr. 13, 2020) (granting pre-trial release to a hypertensive inmate and noting that "the [WHO] classifies those with hypertension as having an increased risk for severe disease and death as a result of COVID-19, with a mortality rate of 8.4%") (citing *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, WHO, at 12); *Smith v. Warden, Toledo Corr. Inst.*, No. 12-CV-425, 2020 WL 1815717, at *14 (S.D. Ohio Apr. 9, 2020) (noting that "the threat [of COVID-19] is particularly significant—indeed, critical—as to those individuals who suffer from preexisting conditions—including Petitioner, who has hypertension") (citing New York State government data))."

Cerebrovascular Disease: The word cerebrovascular is made up of two parts – "cerebro" which refers to the large part of the brain, and "vascular" which means arteries and veins. Together, the word cerebrovascular refers to blood flow in the brain. The term cerebrovascular disease includes all disorders in which an area of the brain is temporarily or permanently affected by ischemia or bleeding and one or more of the cerebral blood vessels are involved in the pathological process. **Cerebrovascular disease** includes stroke, **carotid stenosis**, vertebral stenosis and intracranial stenosis, aneurysms, and vascular malformations.  Restrictions in blood flow may occur from vessel narrowing (stenosis), clot formation (thrombosis), blockage (embolism) or blood vessel rupture (hemorrhage). Lack of sufficient blood flow (ischemia) affects brain tissue and may cause a stroke. *American Association of Neurological Surgeons.*

As noted above, the CDC has stated that people with the following conditions might be at an increased risk for severe illness from COVID-19: … Cerebrovascular disease (affects blood vessels and blood supply to the brain).

**Hyperlipidemia**

Hyperlipidemia is an umbrella term that refers to any of several acquired or genetic disorders that result in a high level of lipids (fats, cholesterol and triglycerides) circulating in the blood. These lipids can enter the walls of arteries and increase your risk of developing atherosclerosis (hardening of the arteries), which can lead to stroke, heart attack and the need to amputate. The risk of atherosclerosis is higher if you smoke, or if you have or develop diabetes, high blood pressure and kidney failure. *Society for Vascular Surgery.*

A new study published on the preprint server *bioRxiv* in May 2020 suggests that the strikingly increased mortality in COVID-19 patients who are either old or also have high blood pressure, diabetes, cardiovascular disease is due to high tissue cholesterol levels.

**Cardiac Arrhymia (Bradycardia)**

Arrhythmias occur when the electrical signals that coordinate heartbeats are not working correctly. An irregular heartbeat may feel like a racing heart or fluttering.  Many heart arrhythmias are harmless. However, if they are highly irregular or result from a weak or damaged heart, arrhythmias can cause severe and potentially fatal symptoms and complications.

Cardiac arrhythmia refers to a group of conditions that cause the heart to beat irregular, too slowly, or too quickly.  There are several categories of arrhythmia, including: **Bradycardia**, or a slow heartbeat.  Most arrhythmias are not severe and do not cause complications. Some, however, can increase the risk of stroke or cardiac arrest.

It should be noted that the Defendant's BOP medical reports note that the Defendant has exhibited many of the symptoms of Bradycardia, such as: chest pain; dizziness; lightheadedness, and fainting or nearly fainting. *Medical News Today, February 28, 2020.*

**Chronic Hepatitis C**

The CDC has stated that currently they have no information about whether people with hepatitis B or hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19. However, based on available information and clinical expertise, older adults (the Defendant is 66) and people of any age who have serious underlying medical conditions, including people with liver disease, might be at higher risk for severe illness from COVID-19, particularly if the underlying medical conditions are not well controlled.

**Overweight (BMI of 29.6)**

The CDC states that adults of any age with the following conditions might be at an increased risk for severe illness from the virus that causes COVID-19:  Overweight (BMI > 25 kg/m$^2$, but < 30 kg/m$^2$).  The Defendant's BMI is 29.6 according to the CDC BMI online calculator.

## AGE OF THE DEFENDANT

Mr. Delancy is sixty-seven (66) years of age.  According to the CDC the following hospitalization and death rate comparisons for those of various ages that contract the Covid-19 virus are set forth below.

|  | **HOSPITALIZATION** | **DEATH** |
|---|---|---|
| 18-29 years | Comparison Group | Comparison Group |
| 30-39 years | 2x higher | 4x higher |
| 40-49 years | 3x higher | 10x higher |
| 50-64 years | 4x higher | 30x higher |
| **65-74 years** | **5x higher** | **90x higher** |
| 75-84 years | 8x higher | 220x higher |
| 85+ years | 13x higher | 630x higher |

In-fact, the CDC has stated that "8 out of 10 Covid-19 deaths reported in the United States have been in adults 65 years old and older."

## PATIENTS WITH MULTIPLE COMORBIDITIES

The Defendant is sixty-six (66) years of age and as discussed above suffers from multiple comorbidities.  Studies have found that patients with *multiple comorbidities*, as in this case, have "greater disease severity" and poorer outcomes.[3]

The startling statistics mean that there is now a "substantial risk" that, unless the Court grants compassionate release, the Defendant will, "with an unsettlingly high degree of probability, serve a life sentence," if he contracts the Covid-19 virus. *United States v. Bess*, No. 1:16-cr-156, 2020 WL 1940809, at *10, (W.D.N.Y. Apr. 22, 2020) (granting compassionate release).

---

[3] *See, e.g.*, Wei-jie Guan, et al., Comorbidity and its impact on 1590 patients with COVID-19 in China:   a   nationwide   analysis;   *Eur.   Respir.   J.*,   (May   2020), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC7098485/.

Yet many patients with preexisting conditions who develop severe Covid-19 and do not die will still experience severe illness and require hospitalization. Most people in the higher risk categories who contract Covid-19 will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios, respiratory therapists and intensive care physicians. For high risk patients who do not die from COVID-19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurological damage, and loss of respiratory capacity."[4]

## ARGUMENT

It is well-known that the Covid-19 pandemic poses a serious danger to society, and especially to at-risk or vulnerable inmates. In light of this unprecedented situation, Attorney General Barr had urged the Bureau of Prisons to transfer inmates to home confinement where appropriate to decrease the risks to their health. *Memorandum from the Attorney General (April 3, 2020)*.  The memorandum states that inmates over 60 years of age with severe pre-existing medical conditions serving sentences for non-violent crimes may be transferred to home confinement. (*Id.* at 2.). Inmates who are not transferred to home confinement by the Federal Bureau of Prisons may also file a motion with the district court requesting compassionate release under 18 U.S.C.A. §3582(c)(1)(A) due to *"extraordinary and compelling"* circumstances.

Under the relevant Sentencing Guidelines Policy Statement, the Court "may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent

---

[4] *See also* Ling Mao, et al., Neurologic Manifestations of Hospitalized Patients With Coronavirus Disease 2019 in Wuhan, China, *JAMA Neurol.*, (Apr. 10, 2020); https://jamanetwork.com/journals/jamaneurology/fullarticle/2764549.

they are applicable, the court determines that . . . extraordinary and compelling reasons warrant a reduction." §1B1.13.  The Court must also find that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* at policy stmt. Based on this framework, in order to qualify for compassionate release, the Court must find that "extraordinary and compelling" reasons warrant the Defendant's release; that he is not a danger to the community, and consider the factors in 18 U.S.C. §3553(a).

With regard to the Defendant (age 66) not being a danger to the safety of any other person or to the community, the Unites States Sentencing Commission issued a report December of 2017 entitled, "The Effects of Aging on Recidivism Among Federal Offenders." By way of summary, the report concluded, "Older offenders were substantially less likely than younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased."

[https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf]

Again, courts have repeatedly held that if an inmate has a chronic medical condition that has been identified by the Centers for Disease Control as elevating an inmate's risk of becoming seriously ill from COVID-19, as noted above, that condition may constitute "extraordinary and compelling reasons."

Therefore, the first question for the Court is whether the Defendant's health conditions coupled with the coronavirus pandemic constitute "extraordinary and compelling" reasons warranting his immediate release to commence his term of supervised release.  It is submitted that

based on the increased risks posed by the COVID-19 pandemic and the Defendant's chronic health conditions his release from incarceration at this time is appropriate.

As noted above, in addition to the increased risk of death posed by COVID-19, the Court must also evaluate whether the Defendant is a danger to the safety of others or the community under 18 U.S.C. §3142(g).  The Defendant was convicted of conspiracy to distribute cocaine, cocaine base, and heroin in violation of 21 U.S.C. §846. The Defendant acknowledges that he committed a serious offense for which he is extremely remorseful and for which he fully accepts responsibility.

Further, it is unlikely that he would commit crimes in the future, in-part due to his advanced age of sixty-six (66). Therefore, it is submitted that the Defendant is not a danger to the safety of others or the community.

Finally, the Court should consider the applicable factors pursuant to 18 U.S.C. §3553(a).

It is submitted that in light of the COVID-19 situation and the risks involved, a second look at Mr. Delancy's sentence is appropriate at this time, now that more than twenty-one (21) years have gone by since he began his incarceration.  Essentially, the question may be posed, are the goals of §3553(a)(1), and the need to ensure adequate punishment, deterrence, and community protection fulfilled, by the release of the Defendant from incarceration. In other words, is the continued confinement of the Defendant for the remaining sixty (60) months of his sentence necessary to serve the purposes of punishment under §3553(a)(2).

When looking at the §3553(a) factors, the United States Supreme Court in *Pepper v. United States,* 131 S.Ct. 1229 (2011), stated that it was reasonable to examine a defendant's conduct and activities while he or she has been incarcerated.  In other words, his post-sentencing rehabilitation.

In the case of Michael Keith Delancy, he has no significant incident reports and has dutifully performed his work assignments while incarcerated.  Further, according to his BOP

"Individualized Needs Plan – Program Review," the Defendant has engaged in many self-improvement classes and activities, such as: physical fitness/health education; weight loss class; field maintenance; driver's license courses; he completed a responsible thinking course and received a Certificate of Achievement; RPP personal growth class; he has received a Commercial Driver's Training Certificate; disease prevention; accounting class; consumer economics; job interviewing; resume writing class, and attended GED classes. (The Defendant's Individualized Needs Plan – Program Review, BOP Education Transcript, and Certificates attached hereto as **Composite Exhibit "D"**)

## RECENT CASE LAW REGARDING SENTENCE REDUCTIONS PURSUANT TO TITLE 18 U.S.C. §3582(c)(1)(A)

***This Court has authority to reduce the Defendant's sentence for "extraordinary and compelling reasons" pursuant to 18 U.S.C. §3582(C)(1)(A) other than the medical condition, age and family circumstances of the defendant. (In other words, Congress intended to empower district courts to reduce sentences based on "extraordinary and compelling reasons" other than medical condition, age and family circumstances.)***

On September 25, 2020, the Second Circuit Court of Appeals issued its opinion in *United States v. Brooker, et al.,* 976 F.3d 228 (2nd Cir. 2020), holding that district courts have broad discretion to decide what constitute "extraordinary and compelling" reasons for a reduction in sentence under 3582(c)(1)(A). The court held that district courts are not bound by U.S.S.G. §1B1.13 in making that determination.

In *Brooker,* the Court took a careful look at §1B1.13 and held it could not be the "applicable policy statement" for motions brought by a defendant under the post-First Step Act §3582(c)(1)(A). The court stated, "After all, §1B1.13 makes multiple references to the Bureau of Prisons as the moving entity and in application note 4 expressly states that a "reduction under this policy statement may be granted only upon motion by the Director of the BOP." So, the Court concluded, "§1B1.13 is the policy statement that only applies to motions brought by the

14

BOP.  *Without a policy statement pertaining to motions brought pursuant to §3582(c)(1)(A), the determination is left to the broad discretion of the district court.*" (Emphasis supplied.)

The Second Circuit was careful to explain that, although we call it compassionate release, the statute actually says "reduction in sentence."  The only statutory limitation is that rehabilitation *alone* is not an "extraordinary and compelling" reason.  However, rehabilitation combined with other factors may be an "extraordinary and compelling" reason. The court noted that, "the consideration of these factors and of their possible relevance, whether in isolation or combination, is best left to the sound discretion of the trial court in the first instance."

Very recently, on December 16, 2020 United States District Court Judge Cecilia M. Altonaga in the Southern District of Florida held that district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise, and proceeded to grant time-served to a defendant who had previously been sentenced to life imprisonment. *United States v. Luis Cano,* SDFL Case No. 95-00481-CR-Altonaga [D.E. 965].

In *United States v. McCoy,* 2020 WL 7050097 (4th Cir. December 2, 2020), the Court found that the application note to the Sentencing Guideline making the Bureau of Prisons (BOP) the sole arbiter of whether certain reasons qualify as extraordinary and compelling, could not operate to constrain a district courts' discretion to consider whether any reasons were extraordinary and compelling with respect to motions brought by a defendant.

In *United States v. Gunn,* 2020 WL 6813995 (7th Cir. November 20, 2020), the Court held that the Sentencing Commission's policy statement regarding what constitutes extraordinary and compelling reasons to justify compassionate release is not applicable to compassionate release motions brought by defendants.

In *United States v. Jones,* 2020 WL 6817488 (6th Cir. November 20, 2020), the Court stated in-part, "We now join the majority of district courts and the Second Circuit in holding that the

15

passage of the First Step Act rendered § 1B1.13 "inapplicable" to cases where an imprisoned person files a motion for compassionate release. (Citing *Brooker* above.)  Until the Sentencing Commission updates §1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an "extraordinary and compelling" reason justifies compassionate release when an imprisoned person files a §3582(c)(1)(A) motion."

In *United States v. Eric Millan,* SDNY Case No. 91-CR-685 (April 6, 2020), the court carefully analyzed its authority to reduce Millan's sentence and proceeded to reduce his sentence to time-served from a life sentence pursuant to 18 U.S.C. §3582(c)(1)(A).

In analyzing the court's authority, the court set out its reasoning as set forth below:

Section [18 U.S.C. §3582(c)(1)(A)] provides that district courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction."  Three points bear noting with regard to the operation of 18 U.S.C. §3582(c)(1)(A).

First, in passing the statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983).  Put differently, Congress envisioned 18 U.S.C. §3582(c)(1)(A) acting as a "safety valve[] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. *Id.* at 121.  Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. §3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations." *Id.* This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984 intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling

16

reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.

Second, although the power to reduce sentences provided for by 18 U.S.C. §3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. §3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances.  Rather, if a judge finds the existence of any "extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. §3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." *Id.* at 55-56.

Indeed, the legislative history of 18 U.S.C. §3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of "circumstances."

Third, notwithstanding all of the foregoing, Congress originally conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. §3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts--until the recently enacted First Step Act -- were only authorized to reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP.

The *Millan* court went on to note that the U.S. Sentencing Commission has indicated that the "extraordinary and compelling reasons" upon which a sentence reduction pursuant to 18 U.S.C. §3582(c)(1)(A) may be based are not limited to medical condition, age and family circumstances.

In enacting the Comprehensive Crime Control Act of 1984, Congress tasked the U.S. Sentencing Commission (the "Sentencing Commission") with responsibility for developing standards for identifying the existence of "extraordinary and compelling reasons" for a sentence reduction. See 28 U.S.C. §994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").

When the Sentencing Commission acted in 2007, it promulgated a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances and "other reasons." See U.S.S.G. §1B1.13, Application Note 1(A) (Amendment 698).

Thereafter, in April 2013, the Office of the Inspector General of the Department of Justice (the "OIG") issued a report finding that the Director of the BOP rarely filed 18 U.S.C. §3582(c)(1)(A) sentence reduction motions (even for defendants who clearly met the Sentencing Commission's objective criteria for a sentence reduction). See U.S. Dep't of Justice Office of the Inspector General, the Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013).

In response, the Sentencing Commission expanded its guidance to district courts on qualifying circumstances and encouraged the BOP to file 18 U.S.C. §3582(c)(1)(A) motions whenever a defendant meets the criteria set forth in Section 1B1.13 of the Guidelines. See U.S.S.G. §1B1.13, Application Note 4; *United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines). In doing so, the Sentencing Commission identified several categories of qualifying "extraordinary and compelling reasons," including medical condition, age, family circumstances and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and

compelling reason other than, or in combination with," medical condition, age and family circumstances. U.S.S.G. §1B1.13, Application Note 1(A) (internal quotation marks omitted).

Finally, Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop standards for identifying "extraordinary and compelling reasons" for a sentence reduction: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. §994(t) (emphasis added).

On the one hand, lawmakers no doubt legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984.

On the other hand, legislators' use of the modifier "alone" evidences that they believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

In late 2018, Congress passed the First Step Act, which, among other things, fundamentally transformed the process by which 18 U.S.C. §3582(c)(1)(A) sentence reduction motions are adjudicated. In particular, instead of relying on the Director of the BOP to determine whether "extraordinary and compelling reasons" exist supportive of a sentence reduction and instead of relying on the Director of the BOP to file an 18 U.S.C. §3582(c)(1)(A) sentence reduction motion, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files a request for a sentence reduction motion with the warden of the facility in which he or she is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden of the defendant's facility," whichever happens first. See 18 U.S.C. §3582(c)(1)(A); *United States v. Beck*, Case No. 13-Cr-186-6, 2019 WL 2716505, at *5 (W.D.N.C.

19

June 28, 2019) ("Among other things, [the First Step Act] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BOP Director, so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

Thus, once a defendant files an 18 U.S.C. §3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. §3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. See *Beck*, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement"). And courts have utilized that power.

The case of *United States v. Cantu-Rivera*, Case No. 89-CR-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019), is instructive with regard to court's newfound authority to reduce sentences based on "extraordinary and compelling reasons" (even if those reasons do not relate to medical condition, age or family circumstances).

Initially, the court in *Cantu-Rivera* explained that "[t]he First Step Act of 2018 amended 18 U.S.C. §3582(c)(1)(A) to allow district courts to modify sentences of imprisonment upon motion by the defendant if the defendant has fully exhausted all [BOP] administrative rights . . . or 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id. at *1 (internal quotation marks omitted).  It then reduced that defendant's life sentence (for conspiracy to possess with intent to distribute in excess of five kilograms of cocaine)

to time served (after service of more than 30 years imprisonment) based principally on "the extraordinary degree of rehabilitation" Mr. Cantu-Rivera had accomplished.

Similarly, in *United States v. Cantu*, Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019), the court noted that "[a] court may now," pursuant to 18 U.S.C. §3582(c)(1)(A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *Id*. at *1. It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section 1B1.13 of the Guidelines. *Id*. at *3.

Therefore, in the case-at-bar this Court has broad discretion to determine if Michael Keith Delancy's rehabilitation and other factors constitute an "extraordinary and compelling" reason to reduce his sentence and permit him to commence his term of supervised release with home-confinement and electronic monitoring imposed as special conditions.

## **CONCLUSION**

It is submitted that based on the increased risks posed by the COVID-19 pandemic and the Defendant's chronic health conditions as well as the other factors discussed herein, his release at this time and the commencement of his term of supervised release with home-confinement and electronic monitoring imposed as special conditions is appropriate.

In determining whether "extraordinary and compelling reasons" exist courts do not consider a defendant's medical condition in isolation, rather, courts evaluate a defendant's medical

record as a whole, including taking into account a defendant's age. *Blake*, 15-CR-80018, 2020 WL 4677309 (S.D. Fla. Aug. 12, 2020).

In addition, due to Mr. Delancy's age, he is far more likely to succumb to the virus than that of younger populations. Mr. Delancy suffers from underlying medical conditions, which increase his risk of severe illness or death should he contract COVID-19 regardless of his advanced age. *See Critchlow*, 2020 WL 5544043, at *5 (S.D. Ind. Sept. 16, 2020) (Because the defendant suffered from health conditions that the CDC guidelines identified as possibly increasing the risk of severe illness or death at any age, the Government's argument that the defendant is young was unpersuasive to the court.).

Sadly, for Mr. Delancy, the risk of contracting COVID-19 and becoming critically ill due to the spread of the virus within his prison is not a hypothetical one.  According to the Federal Bureau of Prisons online resource page, as of January 7, 2021, "[t]here are 5,950 federal inmates and 1,946 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 35,426 inmates and 3,111 staff have recovered.  There have been 182 federal inmate deaths and 3 BOP staff member deaths attributed to COVID-19 disease.  Of the inmate deaths, 4 occurred while on home confinement."

Despite the BOP's significant efforts to try to manage the virus in its facilities, as of January 7, 2021 it reports that at FCI Coleman (Medium) 52 inmates and 37 staff members are positive; 3 inmates have died, and 278 inmates and 8 staff members have recovered.  Furthermore, the Government's assurances that the BOP's "extraordinary actions" can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease at the facility where Mr. Delancy is housed.

Because Mr. Delancy is at a greater risk for medical complications if he contracts the virus due to his health status, Mr. Delancy's health and life are in serious danger if he continues to serve

22

his sentence at FCI Coleman (Medium). Therefore, Mr. Delancy's health status in conjunction with the significant outbreak at FCI Coleman (Medium), present extraordinary and compelling reasons that justify the granting of compassionate release.[5]  After all, people in prison or jail may have made bad decisions to wind up behind bars, but they are still human beings worthy of consideration during this medical emergency.  As our country braces itself for more of the effects of the coronavirus, we should make sure that those in the justice system are protected as well.

As stated above, Mr. Delancy does not have a history of committing violent offenses, nor does he pose a danger to the community.  Further, during his period of incarceration Mr. Delancy has made every effort to improve himself.

It is submitted that continued confinement at FCI Coleman (Medium) for the remaining sixty (60) months of his sentence is unnecessary to serve the purposes of punishment under §3553(a)(2).

A reduction to time-served with home-confinement and electronic monitoring imposed as a special conditions of supervised release will still reflect the seriousness of his offense; promote respect for the law, provide just punishment, deterrence, and community protection.  In sum and substance, such a sentence reduction will continue to be in accord with the sentencing principals set forth in Title 18 U.S.C. §3553(a), and will be sufficient, but not greater than necessary, to comply with the sentencing goals set forth in Title 18 U.S.C. §3553(2)(A-D).

---

[5]  *See Riccardi*, 02-20060-JWL, 2020 WL 4260636, at *3 (D. Kan. July 24, 2020) ("The combination of defendant's age, his underlying health conditions, which increase his risk of serious harm from the virus, and the recent outbreak at the facility, where it appears that measures to contain the virus have been ineffective, provides an extraordinary and compelling reason for relief in this case."); *United States v. Vega*, 1:16-CR-00319, 2020 WL 4784797, at *1 (N.D. Ohio Aug. 18, 2020) ("Vega's medical conditions, in conjunction with the presence of COVID-19 at FCI Coleman Low, are extraordinary and compelling reasons that justify his compassionate release.").

23

**WHEREFORE**, Defendant, **MICHAEL KEITH DELANCY**, respectfully prays that this Honorable Court enter its order granting the within Motion for Compassionate Release and for Reduction of Sentence to Time-Served with Home-Confinement and Electronic Monitoring Imposed as Special Conditions of Supervised Release.

Respectfully submitted,

Adam K. Goodman, Esq.
Law Offices of Adan K. Goodman, PLLC
4160 West 16 Avenue, Suite 404
Hialeah, Florida 33012-5853
Telephone: (305) 482-3265
Cell: (954) 695-5126
E-mail: adam@adamgoodmanlaw.com
(Counsel for Defendant, *Michael Delancy*.)

*/s/ Adam K. Goodman*
Adam K. Goodman, Esq.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 13th day of January, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Adam K. Goodman, Esq.
Law Offices of Adan K. Goodman, PLLC
4160 West 16 Avenue, Suite 404
Hialeah, Florida 33012-5853
Telephone: (305) 482-3265
Cell: (954) 695-5126
E-mail: adam@adamgoodmanlaw.com
(Counsel for Defendant, *Michael Delancy*.)

*/s/ Adam K. Goodman*
Adam K. Goodman, Esq.

24

### <u>SERVICE LIST</u>

**United States of America v. Michael Keith Delancy**
**Case No. 3:98-CR-00336-HLA-JBT-1**
**United States District Court, Middle District of Florida**

Julie Hackenberry, Assistant United States Attorney
Office of the United States Attorney
300 N Hogan St
Jacksonville, FL 32202
Telephone: (904) 301-6300
Email: julie.hackenberry@usdoj.gov
CM/ECF